By the Court—Hoffman, J.
The ancient and rigorous rule of the maritime law making the wages of seamen dependent upon the performance of the voyage and earning of freight, is unchanged to this day—so far, at least, as that if the vessel and cargo have utterly perished, wages are lost. I refer to Reed v Hussey, (1 Blatchford & Howland, 526,) as a late authority.
But this rule has, from the earliest times, been accompanied and modified by another. If anything was saved of vessel or cargo, it was applied in payment of wages. “ If a nail,” is the strong language of the Oonsolato, “ is saved from the wreck, it shall go to the salary of the mariners.”
The Hanseatic ordinance of 614 directed that if so much of the ship be saved as equals the amount of the wages, the seamen shall be paid the whole amount due them. The ordinance of Rotterdam (2 Magens, 114,) directed the payment of wages out of the relics of the ship; and, by the judgments of Oleron, “ though there should be saved of the ship only a cable or a nail, it is pledged for the payment of wages.”
*274 By the ordinance of the French Marine of Louis the Fourteenth, “ if any part of the ship be saved, the sailors hired for the voyage or by the month shall be paid their wages out of what is saved of the wreck; and if there are only goods saved, the sailors shall be paid in proportion to the freight received; and in addition they shall be paid for the days employed by them in saving the wreck and effects shipwrecked.” (Emerigon, 116.)
The leading case of the Neptune, (1 Hagg. Ad. R., 227,) established it as a part of the English Law, that where parts of the vessel are saved by the exertions of the seamen, though no part of the cargo is preserved, the wages of the crew were to be paid out of what is rescued. Lord Stowell rejected the idea that the seamen were thus compensated in the capacity of salvors. The duty of service had continued; the relations under the contracts survived; the authority of the master did not cease at the moment of the wreck, nor the obligation of the crew expire.
The American cases abundantly sustain the rule that the remnants of the vessel must be applied to pay the mariner. They are cited in Mr. Perkins’ note to the Fifth American Edition of Abbott on Shipping, (p. 632, marginal paging.) I refer particularly to Lewis v. The Elizabeth Jane, (Ware’s R., 41,) and The Dawn, (Daveis’ R., 121 ;) and I think the weight of authority is strong to show that they do not take as salvors.
The sailor’s privilege thus adhering to the last relic of the vessel, what is the case when the vessel has utterly perished, but a portion of the cargo has been saved, and freight upon such portions is earned? Justice Stout, in Sheppard v. Taylor, (5 Peters’ U. S. R., 711,) says: “Freight being the earning of the ship in the course of the voyage, it is the natural fund out of which the wages are contemplated to be paid; for though the ship is bound by the lien of wages, the freight is relied on as the fund to discharge it, and it is also relied upon by the master to discharge his personal responsibility. We think, then, that this relation *275 between the freight and wages does, by the principles of the maritime law, create a claim or privilege in favor of the seamen to proceed against it under the circumstances of the present case. Here the owner of the ship is also the owner of the cargo. There has been an award allowing the assignees freight, and the owners are insolvent. We can perceive no principle why, in the present case, the seamen may not justly assert a claim on the freight, if the proceeds of the ship are exhausted without satisfying the amount of the wages. Ho authority has been produced against it, and we think it justly deducible from the general doctrines of the maritime law on this subject.”
As early as the case of the Sophia, (1 Gilpin’s R., 77,) Judge Hopkixsox decided, that if any portion of a vessel was saved upon a shipwreck, the crew were entitled to their wages out of it. In the case of the Hercules, (Gilpin, 184,) he gave wages as such.
Poland v. The Brig Spartan, (Ware’s R., 134,) was the case of a libel against the freight and cargo of a vessel for wages. The Oourt held, that the seamen had a lien, as well on the freight as on the vessel. The case arose upon a charter party to the defendants, Quincy and others, who had assigned the share of the cargo belonging to themselves, and the freight of the rest, for the benefit of creditors. The seamen were provided for in certain order of preference. It was held that the freight of the goods consigned to others, and the goods of the charterers, were liable for the wages, and could be reached in admiralty.
In Skolfield v. Potter, (Daveis’ R., 392,) the learned Judge reiterated the doctrine of Poland v. The Spartan. He held, that the freight was hypothecated for the wages, and every part of the freight was liable for the whole wages. Merchandise was bound to the ship for the freight, and the freight to the seamen for their wages. And if owners of the ship are owners of the cargo, the cargo owes freight to the ship, and this freight is pledged for the wages.
*276 The Louisa Bertha, (1 Eng. L. and Eq. R., 665,) was a suit by the mate and seamen, prosecuted against the ship and freight, and the claim was resisted by the holders of a bottomry bond. Lushimgtoít said: “The general rule, no doubt, is this—that seamen’s wages are considered a lien on the ship, and are entitled to a priority as against all other claims; as against the owners of the ship the seamen have a perfect right to be paid out of the ship and freight, even if the wages had been earned in two or three previous voyages.
In the case of the Lady Durham, (3 Hagg. Ad. R., 196,) the Court say: “A mariner has no lien on the cargo as cargo. His lien is on the ship and on the freight, as appurtenant to the ship, and so far as the cargo is subject to freight, he may attach it as a security for the freight that may be due.” Whether, if cargo was saved, it could be held to represent the freight, was a question the learned Judge adverted to, but did not decide.
The 13th rule in Admiralty of the United States Courts directs that, in all suits for mariner’s wages, the libelant may proceed against the ship’s freight and master, or against the ship and freight, or against the owner or master alone in personam.
It appears to me entirely clear, that in the case of a vessel wholly destroyed, and cargo saved, the wages attach to the freight of the latter; and I apprehend the better opinion is that the privilege exists as to any part of freight paid upon part of a continuous voyage, as well as upon that resulting from the goods saved at the shipwreck.
The next inquiry is: What is the rule, when there is saved both enough of the ship and enough of the freight to discharge the wages of the mariners? Such is the present case. It is, I believe, entirely undecided in our Maritime Law.
Emerigon discusses the question: “Are the wages to be taken on the freight rather than on the wreck ? A vessel is wrecked; the merchandise and rigging are saved; the *277 sailors have a privilege on the freight, and on the vessel, in solido. If the sailors are paid out of the remains of the wreck, there might remain nothing for the insurers. Are the latter entitled to oblige the sailors to turn to the freight, or to reimburse themselves out of the freight for the value of the wreck absorbed by the crew? ” “ Since
the freights are fruits of the vessel, it is just that they should be first employed to pay the wages of those who have produced them by them labor. This destination comes from the nature of things, whereas the privilege on the hull is opposed to the common law, as authors tell x us,” citing Stypman, Buricke and Straccha.
He cites an Arret of the Parliament of Aix precisely to the point—where the owner, who had paid wages out of the wreck saved, and had received freight on part of the voyage, was compelled to pay the insurers on the vessel the value of the wreck saved, without allowance for wages.
But the 259th Article of the French Code of Commerce, provides, that if some part of the vessel be saved, the seamen engaged by the voyage or the month are to be paid their wages already due out of the wreck which they have saved. If the wreck be not sufficient, or if there be only goods saved, they shall be paid them wages subsidiarily out of the freight. The 258th Article had recognized the rule that in case of stranding, capture or shipwreck, with a total loss of vessel and cargo, the seamen lose them wages.
The Commentators appear to have found this article of the Code so explicit as to need little illustration. M. Pardessus, (Vol. 3, No. 681,) observes: “If apart of the ship is saved, however inconsiderable, the seamen are to be paid their wages earned from the proceeds of the remnants. There is to be deducted the expenses of salvage, whether effected by the captain, by public authority, or by volunteers. This deduction is founded on the principle of civil law, which declares that all expenditures *278 for the preservation of a thing constitute privileges upon it.”
The author shows that the seamen may participate in the compensation for such salvage expenses, under regulations prescribed by the government in an Arret of 1801.
He then puts the case under the last clause of the article, making freight responsible when the wreck saved is insufficient, that this right covers freight earned and paid or due on the outward part of a voyage out and home.
M. Boulay Paty, in discussing this article, states the opposing views of M. Valin and Emerigon, upon the question whether the seamen have a lien for wages on outward freight received, as well as freight on the return voyage, and he concludes that they can claim upon such outward freight for wages of the outward voyage, but not for those of the voyage of return. (Droit Commercial Maritime, tom. 2, p. 225.)
Thus the authorities of the French law establish that the fortune of the ship, as Emerigon terms it—the wnole of the freight and the whole of the vessel, and each and every relic of either saved upon a shipwreck, is pledged for payment of the seamen. But that law distinguishes and makes the vessel and all that is rescued of her the first fund or subject to be resorted to, and the freight only secondarily.
I have therefore quoted the language of Justice,Story, in Sheppard v. Taylor, indicating that there may be a resort to the freight on goods saved, after the relicts are exhausted. It is proper to notice that the point did not arise, nor does the sentence appear to carry it into practice.
In the case of the Niphon’s crew, (13 Boston Law Reporter, [Monthly Law R., N. S., vol. 3,] 266,) Mr. Justice Woodbury held to the rule, in its utmost rigor, that freight is the mother of wages. That hence the saving of the vessel, in whole or in part, gives no title to wages, if freight is not earned. The earning of freight, alone, or its being earned, being prevented by the owner, eonsti *279 tuted the title to wages. It was the cargo or freight saved, and not the ship, which was the seamen’s security. Therefore, if the security of freight fail, the seamen can only look to the fragments of the wreck, as salvors. This he allowed they could do. It should be observed that the positive decision was that the owners of cargo were not personally liable.
This line of reasoning is logical and consistent, if it is conceded that the moment a wreck occurs, (resulting in the loss of the cargo,) whatever the seamen do to save vessel or cargo, they do as salvors; that the relation as mariners is extinguished, and a new one established. Then the expenses of salvage are deducted naturally from the thing saved; and wages, if adopted as the rate of compensation, are part of such expenses. And then, when portions of the cargo and portions of the vessel are preserved, a proportion of such salvage expenses should fall upon each corresponding with the amount so rescued.
But the basis of this reasoning fails, if we yield, as it seems to me we must, to the argument of Lord Stowell in the case of the Heptune, that seamen cannot be, except in some rare instances, regarded as salvors. And this proposition has received the sanction of the Supreme Court of the United States, in Hobart v. Drogan, (10 Peters’ U. S. R., 110.) Mr. Justice Story states it explicitly, and adopts Lord Stowell’s definition of a salvor.
It may tend to throw some light upon a question thus undecided, if we look to the relations and obligations of the owner of the vessel to the shipper. His duty con-' tinues after shipwreck as imperative as it was before. He is bound to use every effort to protect and forward the goods. His responsibility as a common carrier survives the disaster.
In the expressive though figurative language of the maritime law, this is the duty of the ship to the cargo; and accordingly the foreign law and our own hold that the ship, in specie, is security to the shipper of goods. The whole subject is so fully examined and settled in the case *280 of the Rebecca, (Ware’s R., 188,) that a reference to any-other authority is needless. It was held that the ship was bound, and could be libeled for damages sustained by the goods from the fault of the master.
It is true the merchandise is correlatively bound to the ship. It is so bound as to afford security for the payment of the compensation agreed upon, if the conditions are complied with and the property delivered. In the case of the Rebecca, the learned Judge quotes the Consulate of the Sea, (chs. 58 and 63,) as determining that if any part of the cargo is damaged, the captain shall bear the loss, and if he is unable to pay, the ship shall; and if the ship is sold, the merchant shall be preferred to all other creditors, except the seamen for their wages.
How, this duty would not be performed if the cargo or its owners were subject to any charge for the wages of seamen exerting themselves to rescue it. Then, as between owners of cargo and owners of vessel, the case is entirely clear. The ship must answer. But what is freight ? Practically and ultimately, it is that portion of the cargo which is necessary to pay the transportation of the whole. The shipper receives his goods subject to a burden, which it takes so much of his goods to discharge. How, to test the question justly, we must suppose a distinct ownership of the ship and of the freight. If it is the obligation of the vessel and all that remains of her to exonerate the cargo generally from the payment of wages, it seems both logical and just to hold that such portion of the cargo as represents freight should be equally excepted. Between the owner of a vessel and the owner of her cargo, the primary and absolute obligation to deliver it on payment of ' freight renders the case very clear, that the owner of the vessel must apply whatever is saved of her in exoneration of the owner of the cargo from expenses attending the delivery. Between insurers of vessel and insurers of cargo, the rule must be the same, as they are substitutes for the respective owners; and the rule seems to me to be equally just and sound, when the question arises either between *281 insurers on vessel and insurers on freight, or as in the present case, between the owner of the vessel and insurers on freight.
The abandonment here gave a right to the insurers to all the freight received on the goods saved, had they paid a total loss. The plaintiff received the three-fifths on their account, because the plaintiff had funds sufficient to pay the wages, derived from another fund primarily liable.
My conclusion is, that whenever, upon a wreck taking place, portions of the vessel and portions of the cargo are, saved, and the proceeds of the former and freight upon the latter are received, the proceeds of the former are first applicable to the payment of the wages of seamen who have labored for the preservation of both.
In this case the claim of the plaintiff was $15,000. He admits payment of $12,500. Three-fifths of the freight collected by him is $2,565.69, so that he has received $65.69 beyond his demand, and this sum belonged to the defendant.
As the case is presented to us, there must be a new trial, with costs to abide the event.1